UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DENNIS HARRINGTON,

                Plaintiff,

       v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

14-CV-6044P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Dennis Harrington ("Harrington") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 8).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 7, 10).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Harrington's motion for judgment on the pleadings is denied.

**BACKGROUND**

**I.      Procedural Background**

Harrington applied for DIB on March 23, 2011, alleging disability beginning on December 31, 2010, due to diabetes, arthritis, right hip replacement, high cholesterol and high blood pressure.  (Tr. 60, 123, 150, 153).[1]  On May 10, 2011, the Social Security Administration denied Harrington's claim for benefits, finding that he was not disabled.  (Tr. 71-74).  Harrington requested and was granted a hearing before Administrative Law Judge Brian Kane (the "ALJ").  (Tr. 79, 87-91).  The ALJ conducted a hearing on June 27, 2011 in Rochester, New York.  (Tr. 27-61).  Harrington was represented at the hearing by his attorney Gregory Phillips, Esq.  (Tr. 27, 69).  In a decision dated September 26, 2012, the ALJ found that Harrington was not disabled and was not entitled to benefits.  (Tr. 12-23).

On December 11, 2013, the Appeals Council denied Harrington's request for review of the ALJ's decision.  (Tr. 1-5).  Harrington commenced this action on January 30, 2014, seeking review of the Commissioner's decision.  (Docket # 1).

**II.     Relevant Medical Evidence[2]**

**A.      Treatment Records**

**1.      Darren Tabechian, MD**

Treatment records indicate that Harrington began treatment for his rheumatoid arthritis with Darren Tabechian ("Tabechian"), MD and the Allergy/Immunology/Rheumatology Clinical Group and University of Rochester Medical Center ("URMC") in March 2005.  (Tr. 210).  Prior to that time, Harrington had treated with at least two other doctors, but had not

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

been at the URMC clinic in several years. (*Id.*). After an examination, Tabechian indicated that

Harrington's arthritis was "well controlled" by his medication regimen, which included

Methotrexate and Remicade. (*Id.*). In July 2005, Harrington reported to Tabechian that he was

not having any joint symptoms and wanted to explore reducing the frequency of his Remicade

infusions. (Tr. 208). Tabechian planned to reduce the frequency of Harrington's Remicade

infusions and also decreased his Methotrexate dose from ten to five milligrams. (*Id.*).

In April 2006, Harrington returned to the clinic complaining of a "trigger finger at

the right thumb." (Tr. 204). Harrington reported that his symptoms in general had "been going

much better for him," although Tabechian noted that Harrington had not had lab work done as

instructed. (*Id.*). According to Harrington, he experienced no morning stiffness and "is enjoying

a regular way of life." (*Id.*). Upon examination, Tabechian noted a nodule in Harrington's hand

and treated it by injecting ten milligrams of Depo-Medrol. (*Id.*).

In September 2006, Harrington had an appointment with Tabechian and reported

that he was doing well. (Tr. 202). Harrington complained of recurrent triggering and limited

range of motion in his right hand and indicated that he experienced some pain in his ankles and

knees after refereeing soccer matches, an activity that he had recently recommenced. (*Id.*).

Upon examination, Tabechian observed tenderness in Harrington's right thumb, but did not

detect any effusion in his knees or ankles and indicated that the examination was otherwise

normal. (*Id.*). Tabechian recommended an analgesic and ice for exercise-related joint pain and

referred Harrington to a surgeon to assess surgical options for the ongoing stenosis in his right

thumb. (*Id.*).

During the same visit, imaging was conducted on Harrington's ankles, feet, knees

and hands in order to assess the progression of his rheumatoid arthritis. (Tr. 212-29). The

images were compared to radiographs taken on October 31, 2003.  (*Id.*).  Vanessa Zayas-Colon ("Zayas-Colon"), MD, opined that the images of Harrington's hands and feet showed "stable appearance" cystic or erosive changes and that his ankles and knees demonstrated no evidence of new erosive changes.  (*Id.*).  Zayas-Colon's overall impression was stable appearance bilateral sequelae of remote MCL injury with no erosive changes identified and stable diffuse bilateral osteopenia.  (Tr. 214).

In December 2006, Harrington returned to the clinic for evaluation of his arthritis. (Tr. 200).  Harrington reported general improvement in his symptoms.  (*Id.*).  According to Harrington, surgery for his trigger finger was successful, and although he was experiencing some transient joint symptoms, he reported that he was generally feeling well and looking forward to retirement.  (*Id.*).  Upon examination, Tabechian noted strong grip strength and normal hips and knees, although he noted some pain with left lateral rotation of the neck.  (*Id.*).  Tabechian opined that Harrington's arthritis was well-controlled with his current medication regimen.  (*Id.*).

In November 2008, Harrington returned to the clinic for continued evaluation of his arthritis.  (Tr. 198).  He reported that although he occasionally experienced joint pain or swelling lasting approximately a day, he generally continued to do well.  (*Id.*).  After an examination in which Tabechian noted strong grip strength, no knee tenderness and a contracture of the left elbow at 170 degrees, Tabechian opined that Harrington's arthritis was stable on his current regimen.  (*Id.*).

Approximately five months later, in April 2009, Harrington attended a follow-up appointment with Tabechian.  (Tr. 196).  During the appointment, Harrington complained of increased pain in his right hip that caused him to stop refereeing soccer games.  (*Id.*).  Tabechian noted that Harrington had undergone a total hip arthroplasty in 2003 and recommended that he

follow up with his arthroplasty physician to determine whether his pain could be alleviated. (*Id.*).  Upon examination, Tabechian noted that Harrington's grip strength was strong and that he had no deformity in his hands or wrists.  (*Id.*).  Further, his gait was not antalgic during the appointment.  (*Id.*).  Tabechian opined that Harrington's arthritis was stable and recommended imaging to confirm his impression that the arthritis had not progressed.  (*Id.*).

Harrington did not return to the clinic until November 2010, approximately one and a half years later.  (Tr. 194).  During the visit he reported that his symptoms had been generally stable, although he had experienced right thigh pain for which he received treatment from Dr. Drinkwater.  (*Id.*).  With respect to his arthritis, Harrington reported some "left lateral epicondylar discomfort on a mechanical basis," but no other arthritis-related symptoms.  (*Id.*). Tabechian's impression was that the arthritis was adequately controlled, and he considered ordering the Remicade infusions for every ten weeks instead of every eight weeks.  (*Id.*).

On May 25, 2011, Harrington returned to Tabechian for an assessment of his arthritis.  (Tr. 306).  Harrington reported that he experienced some crepitus from his prosthetic hip, but that he did not experience significant discomfort and was generally doing well.  (*Id.*). He experienced no significant morning stiffness, but reported that he did not believe he could meet the duties of his previous employment with the state, although he was working part-time as a security guard.  (*Id.*).  Upon examination, Tabechian noted that he appeared "well without significant deformity of his hands, wrists or elbows" and that he walked with a normal gait. (*Id.*).  Tabechian recommended that Harrington continue with his current medication regimen. (*Id.*).

That same day, images were taken of Harrington's wrists, hands and feet. (Tr. 296-305).  The radiologist, Steven Weiss ("Weiss"), observed "subtle radiolucent/erosive

changes within multiple carpal bones" of Harrington's wrists, but observed that there was no significant change from the images taken in 2006.  (Tr. 296-99).  With respect to Harrington's feet, Weiss observed erosive changes in the base of the first proximal phalanx on both feet and mild superimposed osteoarthritic degenerative change at the first MTP joint of the left foot, but noted that bone mineralization was within normal limits for the right foot and slightly decreased for the left foot and that there had not been any significant interval change since the images were taken in 2006.  (Tr. 300-03).  The images of Harrington's hands, according to Weiss, demonstrated radiolucent/erosive osseous changes in both hands, although bone mineralization was within normal limits and there had been no significant interval change since the images were taken of Harrington's hands in 2006.  (Tr. 304-05).

In December 2011, Harrington returned to the clinic for a follow-up appointment with Tabechian.  (Tr. 294).  Tabechian noted that historically Harrington had suffered arthritis-related pain in his ankles, hands and knees.  (*Id.*).  Harrington reported experiencing increasing pain in his hands at the MCP joints causing a loss of endurance for prolonged work activity.  (*Id.*).  Harrington also complained of episodes of low back pain that he associated with his ongoing, chronic hip problems.  (*Id.*).  Harrington reported hearing grinding or crepitus in his right hip.  (*Id.*).  Tabechian noted that Harrington's increased arthritic-symptoms were "interestingly" not occurring in all of the joints that historically had been symptomatic and that the symptoms appeared to be fluctuating with the Remicade infusions.  (*Id.*).  Tabechian recommended increasing Harrington's Methotrexate dose to determine whether that alleviated his symptoms.  (*Id.*).

On February 29, 2012, Harrington attended a follow-up appointment with Tabechian.  (Tr. 292).  During the appointment, Harrington reported that the increased

Methotrexate had reduced his stiffness and that he was feeling better.  (*Id.*).  Harrington

complained that he had begun to experience a loss of grip strength in his hands that had begun

the previous year.  (*Id.*).  According to Harrington, the loss of strength was particularly evident

when he gripped the clutch while riding his motorcycle.  (*Id.*).  Harrington also complained of

some pain in his femur and hip.  (*Id.*).  Upon examination, Tabechian noted some degenerative

changes of the DIP joints and a somewhat reduced grip strength.  (*Id.*).  Tabechian opined that

the arthritis remained adequately controlled and suspected that the hand symptoms were likely

due to chronic damage, as opposed to inflammatory activity.  (*Id.*).  Tabechian recommended

continuing with the current medication regimen.  (*Id.*).

  Harrington returned to the clinic for an appointment with Tabechian on July 18,

2012.  (Tr. 323).  During the appointment, Harrington reported that he continued to experience

numbness in his hands when riding his motorcycle and holding the clutch or brake.  (*Id.*).  He

also reported that his morning stiffness lasted approximately sixty minutes, which Tabechian

noted was "much less severe than it had been years ago."  (*Id.*).  According to Tabechian,

Harrington's inflammatory symptoms were milder than they had been and Harrington appeared

to be experiencing symptoms due to degeneration, rather than inflammation.  (*Id.*).  Harrington

reported that he was unable to work and had attempted to assist his brother with farmwork, but

was unsuccessful because of joint discomfort and weakness.  (*Id.*).

### 2. Christopher Drinkwater, MD

  Harrington was referred to Christopher Drinkwater ("Drinkwater"), MD, of the

URMC Orthopaedics Department for evaluation of right hip pain.  (Tr. 234-35).  Treatment notes

from his visit with Drinkwater on August 25, 2009 indicate that Harrington had undergone a

complete arthroplasty in 2003.  (*Id.*).  Harrington complained of intermittent right thigh pain that

resulted in episodes of instability. (*Id.*). According to Harrington, during the last episode, the pain lasted approximately three weeks at a level of about five out of ten. (*Id.*). Harrington reported that walking and climbing stairs were aggravating activities. (*Id.*). Upon examination, Harrington demonstrated painless internal and external rotation, painless axial load and neurovascularly, and his right leg was intact. (*Id.*). According to Drinkwater, images of Harrington's hip revealed satisfactory alignment and a well-fixed prosthesis, although pedestal bone formation was present. (*Id.*). Drinkwater opined that the intermittent thigh pain was due to the right hip prosthesis and that Harrington should undergo imaging every two years to monitor the prosthesis. (*Id.*).

Harrington attended a follow-up appointment with Drinkwater on February 9, 2010. (Tr. 232-34). During the appointment, Harrington indicated that he continued to work for the Department of Corrections, but indicated that he was contemplating retiring and "possibly going onto Social Security." (*Id.*). Harrington informed Drinkwater that he may need paperwork completed. (*Id.*). Harrington continued to complain of intermittent thigh pain and stiffness. (*Id.*). Drinkwater reviewed images taken of Harrington's right hip and opined that the images remained satisfactory with some mild sclerotic line around the body of the femoral stem and some mild heterotopic ossification. (Tr. 232, 238). Otherwise, according to Drinkwater, there were no abnormalities. (*Id.*). Drinkwater opined that he expected Harrington to experience some residual symptoms and noted that Harrington should be re-evaluated every two years. (*Id.*).

Harrington had another appointment with Drinkwater on March 29, 2011. (Tr. 230). On that day, images were taken of Harrington's right hip. (Tr. 236). According to Drinkwater, the images demonstrated that Harrington's prosthesis was in a stable position with

no obvious sign of destruction of the articulation. (Tr. 230). The radiologist who reviewed the images opined that they were unchanged from Harrington's previous x-rays. (Tr. 236). Harrington reported that he was experiencing grating and clunking in his right hip with associated mild thigh pain. (Tr. 230). Upon examination, Harrington was able to walk without a limp, had full range of motion and had no distal neurovascular loss. (*Id.*). According to Drinkwater, there was no tenderness and no audible or palpable clunking or grating. (*Id.*). A Trendelenburg test was negative. (*Id.*). Drinkwater advised that Harrington's experiences were normal and that he should contact Drinkwater if the symptoms became aggravated. (*Id.*).

On March 6, 2012, Harrington attended a routine follow-up appointment with Drinkwater. (Tr. 308). Harrington reported that he continued to experience intermittent noises, grating and thigh pain, although he reported that he was managing fairly well and that the noises and grating had not increased since his last visit. (*Id.*). Drinkwater's examination produced the same results as the last examination with no limp, tenderness, distal nerve loss or audible or palpable clunking or grating. (*Id.*). Again, the Trendelenburgh test was negative. (*Id.*). According to Drinkwater, Harrington's x-rays remained satisfactory with no evidence of complications. (*Id.*). Drinkwater opined that Harrington was making satisfactory progress, could continue with his normal activities and should return for monitoring in two years unless his symptoms worsened. (*Id.*).

### 3. <u>Christine Tan, MD</u>

Harrington attended an appointment for a physical examination on January 16, 2009 with Christine Tan ("Tan"), MD. (Tr. 276-80). During the appointment, Harrington reported a history of right hip pain and arthritis. (*Id.*). The treatment notes suggest that Harrington had been diagnosed with diabetes and arthritis. (*Id.*). The notes also indicate that

Harrington smoked and worked at a correctional facility. (*Id.*). Tan ordered bloodwork, which was conducted on February 7, 2009. (Tr. 273). According to Tan, the results indicated borderline cholesterol levels, and Tan recommended that Harrington continue with his current diet. (*Id.*).

Treatment notes suggest that Tan referred Harrington to the URMC Osteoporosis and Bone Densitometry Clinic for a bone density evaluation in May 2009. (Tr. 266-70). According to Allen Anandarajah, MD, the results indicated that Harrington had osteoporosis. (*Id.*).

Tan's treatment records contain lab results dated November 3, 2009 suggesting that Tan continued to monitor Harrington's bloodwork, including his cholesterol levels. (Tr. 255-58). On that same day, Harrington attended an appointment with Tan complaining of gastrointestinal issues. (Tr. 254). At a follow-up appointment on November 17, 2009, Harrington reported that his symptoms had resolved. (Tr. 251).

On April 12, 2010, Harrington attended an appointment with Tan complaining of numbness in his left foot. (Tr. 244). Tan apparently assessed very mild neuropathy. (*Id.*). The treatment records also contain additional lab results dated March 31, 2011. (Tr. 246-48, 250). On November 9, 2011, Harrington attended an appointment with Tan for evaluation of his diabetes. (Tr. 313-14). Harrington reported that he continued to experience clunking in his hip and pain in his hands. (*Id.*). Upon examination, Tan noted that Harrington's hand joints were swollen. (*Id.*).

On July 10, 2012, Harrington attended an appointment with Tan requesting that she complete forms in connection with Harrington's application for social security benefits. (Tr. 311-12). Tan noted that Harrington had a history of diabetes, rheumatoid arthritis and a hip

replacement.  (*Id.*).  According to Tan, Harrington continued to have arthralgias and pain due to those conditions.  (*Id.*).  The treatment notes do not indicate that Tan performed a physical examination during the visit, but suggest that Tan completed paperwork for Harrington's benefits application.  (*Id.*).

> B.   **Medical Opinion Evidence**

On May 2, 2011, state examiner Karl Eurenius ("Eurenius"), MD, conducted a consultative internal medicine examination of Harrington.  (Tr. 283-86).  Harrington reported that he had a history of rheumatoid arthritis, primarily located in his proximal finger digits, feet, knuckles, and occasionally in his elbows and shoulders.  (*Id.*).  Harrington reported that his symptoms were relieved "fairly well" with medications, although he does experience pain in those joints.  (*Id.*).  Harrington also reported that he was diagnosed with diabetes and had a right hip infection that required a hip replacement.  (*Id.*).  According to Harrington, he sometimes experiences tingling and numbness in his fingers and toes.  (*Id.*).

Harrington reported that he cooks five times per week, is able to complete household chores including, cleaning and laundry, and shops twice per week, depending on his right hip and arthritis.  (*Id.*).  Harrington reported that he is able to shower and dress every day, watches television, listens to the radio and continues to engage in limited hunting.  (*Id.*).

Upon examination, Eurenius noted that Harrington had a normal gait, used no assistive devices and did not need any assistance changing for the exam, rising from the chair or getting on or off of the exam table.  (*Id.*).  According to Eurenius, Harrington did not appear to be in acute distress, could stand on his heels and toes and could squat one quarter of the way due to pain in his hip.  (*Id.*).

Eurenius noted that Harrington's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. (*Id.*). Eurenius identified no scoliosis or kyphosis. (*Id.*). Eurenius found that Harrington's lumbar flexion was limited to 80 degrees with minimal pain in the low-mid back, and that his lateral flexion and rotation were unlimited and without pain. (*Id*). The straight leg raise was positive on the left side at 80 degrees with minimal pain and 60 degrees on the right side with pain in the right hip. (*Id.*). Eurenius found full range of motion in the shoulders, elbows, forearms and wrists. (*Id.*). He also found full passive range of motion in the hips, knees and ankles bilaterally, but noted that internal and external rotation of the right hip caused pain. (*Id.*). Eurenius observed some tenderness and mild ulnar deviation of the medial finger joints and slight swelling in the wrists bilaterally with mild warmth. (*Id.*). Eurenius found Harrington's hand and finger dexterity to be intact and his grip strength to be five out of five bilaterally. (*Id.*).

Eurenius diagnosed Harrington with diabetes, rheumatoid arthritis, primarily in the hands, feet, wrists, and knees, and a right hip replacement with necrosis of the hip joint. (*Id.*). He opined that Harrington was limited in prolonged walking, frequent bending, lifting and carrying due to mild right hip pain. (*Id.*). He also opined that Harrington was limited in reaching and handling objects, lifting and carrying due to his rheumatoid arthritis pain in his hands. (*Id.*).

On July10, 2012, Tan completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 316-22). Tan opined that Harrington could frequently[3] lift and carry up to ten pounds, could occasionally[4] lift and carry between eleven pounds and

---

[3] The form defined the term "frequently" to mean "from one-third to two-thirds of the time." (*Id.*).

[4] The form defined the term "occasionally" to mean "very little to one-third of the time." (*Id.*).

fifty pounds, but could never lift or carry more than fifty pounds.  (*Id.*).  According to Tan, Harrington's lifting and carrying limitations were due to tenderness in his hands and feet and swelling in his finger joints.  (*Id.*).  Although Tan indicated that x-rays were enclosed, no x-rays were attached to her statement.  (*Id.*).

According to Tan, Harrington could sit and could walk for two hours without interruption and could stand for one hour without interruption.  (*Id.*).  Tan opined that Harrington could sit and could walk for a total of three hours and could stand for a total of two hours in an eight-hour workday.[5]  Tan indicated that Harrington's limitations were due to tenderness in his hands and feet and the swelling in his finger joints.  (*Id.*).  Tan also opined that Harrington could frequently reach, occasionally handle, finger and push or pull, but could never feel.  (*Id.*).  Additionally, Tan assessed that Harrington could only occasionally operate foot controls.  (*Id.*).  Again, Tan attributed Harrington's limitations to the tenderness in his hands and feet and swelling in his finger joints.  (*Id.*).

Tan opined that Harrington could occasionally climb ramps or stairs, but could not climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl due to his hip replacement.  (*Id.*).  Further, Tan opined that Harrington's diabetes affected his eyesight, preventing him from reading small or ordinary print and viewing a computer screen.  (*Id.*).  Tan assessed that Harrington could frequently operate a vehicle and be exposed to dust, odors, fumes and other pulmonary irritants, but should avoid unprotected heights, vibrations and extreme cold temperatures.  (*Id.*).  Tan also opined that Harrington could not walk a block at a reasonable pace on an uneven or rough surface or sort, handle or use papers or files.  (*Id.*).  According to Tan, Harrington had limitations on his ability to move quickly or for long distances, particularly in an

---

[5]   It should be noted that if the hours of sitting, standing and walking assessed by Tan are aggregated, the total equals eight hours, or a full workday.  (*Id.*).

emergency situation.  (*Id.*).  According to Tan, Harrington's limitations had been present since approximately 2007.  (*Id.*).


III.   **Non-Medical Evidence**

In his application for benefits, Harrington indicated that he had completed the twelfth grade and had previously been employed as a corrections officer, a delivery person and a part-time security officer.  (Tr. 154, 171).  According to Harrington, he worked as a corrections officer for approximately twenty-eight years.  (*Id.*). Harrington reported that his job as a security officer required him to walk for approximately four hours, stand for ten hours and sit for eight hours during a typical twelve hour shift, depending on the duties he was assigned.  (Tr. 173).

Harrington reported that he is able to care for his pet dog, including feeding, walking and bathing the dog, although his wife assists him.  (Tr. 161).  According to Harrington, he is able to care for his personal hygiene, although he has difficulty putting on his shoes and socks, and his personal hygiene tasks are difficult if he is experiencing an arthritic flare-up. (Tr. 161-62).  Harrington is able to prepare his own meals every day.  (Tr. 162).  According to Harrington, he is able to perform most household chores, although it takes him longer to complete tasks and he is unable to perform any tasks requiring heavy lifting or a ladder. (Tr. 163).

Harrington leaves his house daily and is able to walk, drive and ride in a car. (*Id.*).  He also is able to perform the household shopping every couple of weeks.  (Tr. 164). Harrington enjoys hunting, although he goes for shorter distances.  (Tr. 165).  According to Harrington, he can no longer referee soccer games or fish – hobbies that he used to enjoy.  (*Id.*).

14

According to Harrington, he has difficulty lifting objects for long periods of time, walking for long distances, sitting, climbing stairs, kneeling and squatting.  (Tr. 166). Harrington also reported that the strength in his hands is limited as they tend to get painful and stiff.  (*Id.*).  According to Harrington, he experiences pain in his hands, wrists, feet, hips, elbows, shoulders, right thigh and back.  (Tr. 167).

During the administrative hearing, Harrington testified that he had worked for approximately twenty-eight years as a corrections officer before retiring due to his physical limitations.  (Tr. 35).  Harrington also testified, however, that he would "probably still be working" if he had been unable to retire.  (Tr. 50).  After retiring, Harrington continued to work as a security guard for Watkins Glen International, primarily on weekends.  (Tr. 36-37). According to Harrington, his duties as a security guard varied, and included directing crowds of people, surveilling properties and escorting staff to vendors to collect payments.  (Tr. 37-42). Eventually Harrington quit working as a security guard because the physical toll was not worth the income the job produced.  (Tr. 43).  Harrington does not believe he would be able to work as a security guard on a full-time basis because it would require too much walking.  (Tr. 48).

Harrington testified that he continues to experience daily issues with his right hip. (Tr. 44).  According to Harrington, he has difficulty carrying objects, climbing stairs and bending over due to pain and "clunking" in his hip.  (*Id.*).  In addition, Harrington testified that the arthritis causes swelling and pain, although it was managed for a period of time through Remicade infusions.  (Tr. 45).  According to Harrington, he experiences stiffness, particularly in the mornings, and the arthritis causes him constant daily pain, particularly in his hands, back and hips.  (Tr. 45-46).  Harrington testified that he has difficulty holding objects for a long time and cannot ride his motorcycle as frequently as he used to because he has difficulty holding the

15

clutch.  (Tr. 46-47).  According to Harrington, he rides his motorcycle approximately twice a week.  (Tr. 47).

Harrington continues to hunt for "big game," primarily deer, but only went hunting twice during the prior year.  (Tr. 51).  According to Harrington, it is difficult for him to walk in the snow.  (*Id.*).  Harrington testified that he is able to care for his lawn and perform household chores, including vacuuming and taking out the garbage.  (Tr. 49).

A vocational expert, Peter Manzi ("Manzi"), also testified during the hearing. (Tr. 53-60, 118).  The ALJ first asked Manzi to characterize Harrington's previous employment. (Tr. 54).  According to Manzi, Harrington had previously been employed as a corrections officer and a security guard.  (Tr. 67).

The ALJ then asked Manzi whether a person would be able to perform any of Harrington's previous jobs if he were of the same age, had the same education and vocational profile, and could occasionally lift and carry up to fifty pounds, could sit for two hours without interruption and up to three hours in a workday, could stand for one hour without interruption and up to two hours in a workday, and could walk for two hours without interruption and up to three hours in a workday, could never perform feeling activities, but could perform fingering and handling activities occasionally, and could occasionally push and pull up to fifty pounds, could occasionally operate foot controls and climb stairs and ramps, but could never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl, could never work at unprotected heights, could occasionally work around moving mechanical parts, in humidity or wetness and in extreme heat, but could never work in extreme cold or in vibrations.  (Tr. 56-57).  Manzi testified that he believed the standing and walking limitations appeared inconsistent with each other and opined that such an individual would be unable to perform the previously-identified positions, but would

16

be able to perform other sedentary positions in the national economy, although he noted that the

position he identified would require an individual to sit for four hours.  (Tr. 58).  The ALJ then

asked Manzi whether the same individual could perform Harrington's previous positions if the

individual had the same limitations, except that the individual could sit for up to six hours and

stand and walk up to six hours during an eight-hour workday.  (Tr. 58-59).  Manzi opined that

such an individual could perform the job of security guard.  (*Id.*).  Manzi also testified that such

an individual could perform other jobs, including collator operator and photocopy machine

operator.  (Tr. 59).


## DISCUSSION

### I.  Standard of Review

   This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five-steps are:

> (1)  whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment"
       that "significantly limits [the claimant's] physical or mental
       ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments
       meets or equals one of the impairments listed in Appendix
       1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments,
       the claimant retains the residual functional capacity to
       perform his past work; and

(5)    if not, whether the claimant retains the residual functional
       capacity to perform any other work that exists in significant
       numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.    The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims. (Tr. 12-23). Under step one of the process, the ALJ found that Harrington has

not engaged in substantial gainful activity since December 31, 2010, the alleged onset date.

(Tr. 14). At step two, the ALJ concluded that Harrington has the severe impairments of

rheumatoid arthritis, diabetes mellitus and status post total right hip replacement surgery. (*Id.*).

The ALJ concluded that Harrington's other impairments, including high blood pressure and high

cholesterol, are not severe. (Tr. 14-15). At step three, the ALJ determined that Harrington does

not have an impairment (or combination of impairments) that meets or medically equals one of

the listed impairments. (Tr. 15-16). The ALJ concluded that Harrington has the Residual

Function Capacity ("RFC") to perform less than the full range of medium work and could lift, carry, push and pull up to fifty pounds occasionally and sit, stand or walk up to six hours in an eight-hour workday. (Tr. 16). Additionally, the ALJ determined that Harrington could never perform feeling activities and could only occasionally finger and handle objects, operate foot controls and climb stairs or ramps. (*Id.*). The ALJ also found that Harrington could never climb ladders or scaffolds, balance, crouch, stoop, kneel or crawl. (*Id.*). With respect to environmental limitations, the ALJ determined that Harrington can never tolerate exposure to unprotected heights, extreme cold and vibrations, but could occasionally tolerate exposure to moving mechanical parts, humidity, wetness and extreme heat. (*Id.*). At step four, the ALJ determined that Harrington is able to perform his prior work as a security guard. (Tr. 21). Additionally, the ALJ determined that Harrington could also perform the positions of collator operator and photocopying machine operator. (Tr. 23). Accordingly, the ALJ found that Harrington is not disabled. (*Id.*).

### B.   **Harrington's Contentions**

Harrington contends that the ALJ's determination that he is not disabled is not supported by substantial evidence. (Docket # 7-1). First, Harrington contends that the ALJ's physical RFC assessment is not based upon substantial evidence because he rejected the only lifting, carrying, sitting, standing and walking medical opinions of record. (*Id.* at 11-17). According to Harrington, the ALJ erred by failing to offer good reasons for rejecting the medical opinions of Eurenius and Tan. (*Id.* at 13-17). Further, Harrington contends that by rejecting those two opinions, the ALJ's RFC assessment as it pertains to lifting, carrying, sitting, standing and walking is not supported by a medical opinion of Harrington's functional capacities and thus lacks substantial evidence. (*Id.* 11-13).

II.     **Analysis**

       An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

A.     **The ALJ's Carrying and Lifting Assessment**

       Harrington contends that the ALJ determined that Harrington retained the ability to perform the lifting requirements of medium work.  (Docket # 7-1 at 11).  This was error, according to Harrington, because it is inconsistent with the opinions of both Eurenius and Tan. (*Id.*).  I disagree with both Harrington's interpretation of the ALJ's RFC determination and his contention that the ALJ's lifting and carrying RFC conflicts with the opinions of Eurenius and Tan.

       Medium work is defined by the regulations as involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967(c).  In contrast, light work is defined by the regulations as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10

pounds." 20 C.F.R. § 416.967(b). Frequent means "occurring from one-third to two-thirds of the time." Soc. Sec. Reg. 83-10, 1983 WL 31251, *6 (1983).

Harrington argues that the ALJ's determination that he could perform medium work necessarily incorporates a determination that he could frequently lift or carry objects weighing up to twenty-five pounds. (Docket # 7-1 at 11). According to Harrington, this conclusion is inconsistent with Tan's opinion that Harrington was capable of frequently lifting and carrying only up to ten pounds and occasionally lifting and carrying up to fifty pounds. (Tr. 316). According to Harrington, it is also inconsistent with Eurenius's opinion that Harrington was limited in his ability to frequently lift or carry. (Tr. 286).

Harrington's arguments misinterpret the ALJ's RFC determination. The ALJ determined that Harrington could perform "*less than the full range* of medium work." (Tr. 16). The ALJ then limited Harrington to performing medium work that required only occasional lifting, carrying, pushing or pulling up to fifty pounds. (*Id.*). The ALJ did not find that Harrington would be able to lift or carry any amount on a frequent basis. This is consistent with the ALJ's hypothetical posed to the vocational expert, which assumed only occasional lifting, carrying, pushing and pulling of objects weighing up to fifty pounds. (Tr. 56). Contrary to Harrington's contention (Docket # 11 at 2), the ALJ did not assume that the individual in the hypothetical could *frequently* lift, carry, push or pull that amount. Rather, I find that the reasonable interpretation of the ALJ's decision is consistent with the opinions of both Eurenius and Tan.

In any event, the potential jobs identified by the vocational expert are consistent with the limitations assessed by Eurenius and Tan. *See Robbins v. Colvin*, 2014 WL 6610143, *9 (M.D. Fla. 2014) (substantial evidence supported ALJ's decision; even if the ALJ's

determination that claimant could perform light work could be considered to conflict with limitations assessed by doctor, the limitations were not inconsistent with sedentary work and the vocational expert identified at least one sedentary position).  Specifically, the vocational expert testified that an individual with the RFC assessed by the ALJ could perform the positions of security guard, collator operator or photocopy machine operator.  (Tr. 59).  Each of those positions requires an individual to be able to exert up to twenty pounds of force occasionally and/or up to ten pounds of force frequently and/or a negligible amount of force constantly.  *See* Dictionary of Occupational Titles ("DOT") at § 207.685-014, 1991 WL 671745; DOT § 208.685-010, 1991 WL 671753; DOT § 372.677-034, 1991 WL 673100.  These requirements are consistent with the limitations assessed by both Eurenius and Tan.  Accordingly, I conclude that substantial evidence supports the ALJ's determination that Harrington is not disabled based upon his carrying, lifting, pushing or pulling limitations.

       **B.**       **The ALJ's Sitting, Standing and Walking Assessment**

Harrington contends that the ALJ improperly determined that he retained the ability to sit, stand and walk for up to six hours during an eight-hour workday.  (Docket # 7-1 at 12-13).  Harrington alleges that this determination was error because it is inconsistent with the limitations assessed by both Eurenius and Tan.  (*Id.*).  Even assuming the ALJ properly rejected the opinions of Eurenius and Tan, Harrington argues, the ALJ's determination that Harrington can sit, stand and walk for up to six hours per workday is not supported by substantial evidence because no medical opinion of record exists supporting Harrington's ability to perform those functions for that length of time.  (*Id.* at 13-18).

As an initial matter, I agree that the ALJ's determination as to Harrington's sitting, walking and standing limitations is inconsistent with Tan's opinion that Harrington could

only walk or stand a total of five hours and sit for a total of two hours during an eight-hour

workday. *See Person-Littrell v. Comm'r of Soc. Sec.*, 2012 WL 3609846, *2 (M.D. Fla. 2012)

(ALJ's determination that claimant could perform the full range of light work, which required

standing or walking for approximately six hours in an eight-hour workday was inconsistent with

doctor's opinion that claimant could stand or walk for five hours in an eight-hour workday).  I

disagree, however, that the ALJ's determination is inconsistent with the opinion of Eurenius,

who assessed that Harrington was limited in his ability walk for prolonged periods.

      Although some caselaw suggests that moderate or severe limitations in prolonged

walking are inconsistent with full range light or medium work,[6] *see Sprinkle v. Colvin*, 2013 WL

3463782, *3 (W.D. Ark. 2013) (opinion that plaintiff had severe limitations for walking and

moderate to severe limitations for standing "calls into question [p]laintiff's ability to stand and

walk for 6 hours per day"); *Malone v. Comm'r of Soc. Sec.*, 2011 WL 817448, *10 (N.D.N.Y.)

(consultative examiner's assessment that plaintiff had moderate limitation with respect to

prolonged standing and sitting "suggests a possibility that prolonged standing might pose a

problem"; ALJ's assessment that plaintiff could perform light work thus was not supported by

the record), *report and recommendation adopted*, 2011 WL 808378 (N.D.N.Y. 2011), other

courts do not consider an opinion assessing moderate limitations for sitting, standing and

walking inconsistent with a determination that the claimant can perform the requirements of light

or medium work, *see Carroll v. Colvin*, 2014 WL 2945797, *4 (W.D.N.Y. 2014) ("several courts

have upheld an ALJ's decision that the claimant could perform light or sedentary work even

when there is evidence that the claimant had moderate difficulties in prolonged sitting or

---

[6] Both light work and medium work require approximately six hours of standing and/or walking during an eight-hour workday.  *See* 20 C.F.R. § 416.967(b)-(c); *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) ("[l]ight work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours"); *Tracy v. Astrue*, 2011 WL 3273146, *7 n.7 (W.D.N.Y. 2011) ("[a] full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday") (quoting Soc. Sec. Reg. 83-10, 1983 WL 31251 at *6).

standing"); *Bass v. Colvin*, 2014 WL 2616190, *6 (W.D. Ark. 2014) (doctor's assessment that

plaintiff had "moderate limitations in walking, standing, lifting and carrying . . . do not appear to

be inconsistent with the ALJ's finding that [p]laintiff can perform light work"); *Nelson v. Colvin*,

2014 WL 1342964, *12 (E.D.N.Y. 2014) ("the ALJ's determination that [p]laintiff could

perform 'light work' is supported by [doctor's] assessment of 'mild to moderate limitation for

sitting, standing, walking, bending, and lifting weight on a continued basis'") (citing *Lewis v.

Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013)); *Hazlewood v. Comm'r of Soc. Sec.*, 2013 WL

4039419, *7 (N.D.N.Y. 2013) (doctor's opinion that plaintiff had "mild to moderate limitations

in walking, pushing and pulling" supported the "ALJ's determination that plaintiff could

physically perform light work"); *Taylor v. Astrue*, 2012 WL 11406670, *13 (N.D.N.Y. 2012)

(doctor's assessment, including his opinion that plaintiff had a moderate limitation in walking,

provided support for the ALJ's RFC assessment that plaintiff could stand/walk/sit for about six

hours in an eight-hour workday); *Marcum v. Astrue*, 2012 WL 2872858, *3 (E.D. Ky. 2012)

(evidence indicating that plaintiff had "strong to severe limitations for lifting and carrying and

moderate limitations for walking, [was] consistent with the ALJ's RFC finding that [plaintiff]

could perform light work"); *Jannetides v. Astrue*, 2011 WL 1298228, *2, 10 (M.D. Fla. 2011)

("the ALJ's RFC assessment [that plaintiff could perform light work with postural limitations]

does not appear to be inconsistent with the limitations imposed by [doctor], who opined that

[p]laintiff had 'mild to moderate limitations for prolonged sitting, standing, walking, climbing, or

heavy lifting'"); *Stacey v. Comm'r of Soc. Sec.*, 2011 WL 2357665, *6 (N.D.N.Y.) (ALJ's

conclusion that plaintiff could walk/stand for up to six hours in an eight-hour workday was

consistent with doctor's assessment of moderate limitations in plaintiff's ability to lift, carry,

walk, stand and bend), *report and recommendation adopted*, 2011 WL 2293328 (N.D.N.Y.

2011); *Carpenter v. Astrue*, 2010 WL 2541222, *5 (W.D.N.Y. 2010) (consultative examiner's opinion that plaintiff was moderately limited in prolonged standing, walking, kneeling and climbing was consistent with ALJ's conclusion that plaintiff could perform sedentary and light work); *Amons v. Astrue*, 617 F. Supp. 2d 173, 176 (W.D.N.Y. 2009) (examining physician's opinion that plaintiff had moderate limitations in walking, standing, squatting, climbing and reaching supported ALJ's determination that plaintiff could perform a full range of light work with some fingering, reaching and environmental limitations); *Thompkins v. Astrue*, 2007 WL 4372924, *5 (W.D. Ark. 2007) (ALJ appropriately assessed that plaintiff had the capacity to perform full range of light work where doctor had opined that plaintiff had "moderate limitations of prolonged standing/walking").

In this case, Harrington's ability to sit, stand or walk for up to six hours per day is supported by other substantial evidence in the record, and the ALJ provided reasons "tending to support the finding that, despite the moderate limitations[,] . . . [plaintiff] could still perform light [or medium] work." *See Carroll v. Colvin*, 2014 WL 2945797 at *4. The ALJ supported his determination that Harrington could sit, stand and walk for up to six hours a day with extensive discussion of the treatment notes of both Tabechian and Drinkwater. (Tr. 17-19). For instance, Tabechian's treatment records indicated that although Harrington continued to experience arthritis-related symptoms, those symptoms were "much less severe than it had been years ago." (Tr. 323). Additionally, the May 2011 images contained in Tabechian's treatment records demonstrated no significant changes from previous images. (Tr. 296-305). Similarly, Drinkwater's treatment records consistently demonstrated satisfactory examinations and images that revealed no evidence of complications. (Tr. 234-38, 308).

Moreover, as the ALJ explained, his determination as to Harrington's sitting,

walking and standing capabilities is supported by Harrington's own statements concerning his

broad range of activities of daily living.  (Tr. 20-21).  According to Harrington, he continues to

be able to perform his own personal hygiene, complete household chores, maintain his lawn, ride

his motorcycle twice per week and hunt.  (Tr. 20).  Additionally, Harrington continued to

perform duties as a security guard for months after his alleged onset date, including working long

shifts.  (Tr. 21).  *See* 20 C.F.R. § 416.929(c)(3) (a claimant's "pattern of daily living" is an

"important indicator of the intensity and persistence of [the claimant's] symptoms"); *Durante v.*

*Colvin*, 2014 WL 4843684, *2 (D. Conn. 2014) (ALJ properly discussed plaintiff's activities of

daily living when formulating RFC; "[w]hile that court's admonition as to the ill wisdom of

relying thoughtlessly on evidence of a claimant's ability to manage activities of daily living . . .

for the purpose of discrediting evidence of more serious-seeming RFC restrictions in the work

context is well-taken, the ALJ does not appear to have erred in this way here"); *Prue v. Comm'r*

*of Soc. Sec.*, 2014 WL 37669, *10 (D. Vt. 2014) ("[i]t was proper for the ALJ to consider

[plaintiff's] daily activities in determining his RFC").  Accordingly, although the ALJ stated that

he disagreed with Eurenius that Harrington had limitations for prolonged walking, I conclude

that the limitations he ultimately assessed are nonetheless consistent with Eurenius's opinion

and, in any event, are supported by substantial evidence in the record.

Further, I disagree with Harrington's contention that the ALJ failed to provide

good reasons for rejecting the limitations assessed by Tan, Harrington's treating physician.

Generally, a treating physician's opinion is entitled to "controlling weight" when it is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record."  20 C.F.R.

27

§ 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence"). Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician, because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture of the claimant's medical history." *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199. The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992 at *4. The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello*

*v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *See id.*

I conclude that the ALJ provided "good reasons" for his decision to give limited weight to Tan's opinion concerning Harrington's ability to sit, walk and stand. (Tr. 21). In his decision, the ALJ discounted Tan's opinion on the grounds that it was inconsistent with other substantial evidence in the record. Specifically, the ALJ noted that the treatment records relating to Harrington's hip and arthritis demonstrated that both conditions were generally stable, that the arthritis was controlled by medication and that Harrington's arthritic symptoms had improved from prior years. (Tr. 18, 21).

Tan relied upon Harrington's complaints of arthritic-symptoms when assessing the sitting, standing and walking limitations, and the ALJ concluded that the record did not support limitations to the degree assessed by Tan. In discounting Tan's opinions, the ALJ noted that the x-rays of Harrington's wrists, hands and feet revealed no significant changes since 2006 and that the erosive and cystic changes that were present since 2006 had not previously prevented Harrington from performing substantial gainful activity. (Tr. 18). Further, the ALJ explained that the significant limitations imposed by Tan were inconsistent with Harrington's admissions concerning his activities of daily living. I agree. Accordingly, I conclude that the ALJ did not violate the treating physician rule by determining that he was affording "limited weight" to certain opinions of Tan for the reasons he explained. *See Scitney v. Colvin*, 2014 WL 4058975, *11-12 (W.D.N.Y. 2014) (ALJ properly discounted opinion of treating physician where the opinion was inconsistent with the record as a whole, including the opinions of state

consultative physicians and claimant's testimony of daily activities); *Molina v. Colvin*, 2014 WL 3925303, *2 (S.D.N.Y. 2014) (ALJ did not err in declining to credit opinion of treating physician where the "opinion was contradicted by 'other substantial evidence in the record,' including two other doctors' opinions"); *Atwater v. Astrue*, 2012 WL 28265, *4-5 (W.D.N.Y. 2012) (ALJ properly found treating physician's opinion inconsistent with record as a whole where opinion conflicted with opinions of state agency medical consultants and was inconsistent with claimant's reported activities), *aff'd*, 512 F. App'x 67 (2d Cir. 2013).

Harrington contends that by discounting the opinions of Tan and Eurenius, the ALJ created a gap in the record requiring remand. Although the ALJ afforded limited weight to both opinions, his RFC assessment nonetheless accounts for the majority of the limitations assessed by both doctors. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (ALJ was not required to supplement the record with medical source statement where ALJ rejected the consultative examiner's opinion, but ultimately accounted in the RFC for most of the limitations assessed by the examiner). First, as discussed above, consistent with Eurenius's and Tan's opinions that Harrington suffered from limitations in his ability to lift and carry, the ALJ restricted Harrington to occasional lifting of up to fifty pounds. (Tr. 16, 286, 316). Next, although the ALJ did not adopt Tan's or Eurenius's opinion concerning Harrington's walking and standing limitations, he limited Harrington to walking or standing up to six hours during an eight-hour workday, a limitation consistent with the moderate limitations assessed by Eurenius and the evidence in the record. (Tr. 16, 286, 317). To account for the handling and fingering limitations assessed by Eurenius and Tan, the ALJ limited Harrington to occasional fingering and handling activities, with no feeling activities. (Tr. 16, 286, 318). Further, the ALJ's RFC accounted for the postural and environmental limitations assessed by Tan. (Tr. 16, 319-20).

The only limitation identified by Tan that *may* not have been accounted for by the ALJ's RFC assessment was the two-hour sitting limitation identified by Tan. It is not clear whether the ALJ's assessment that Harrington could perform less than the full range of medium work is inconsistent with Tan's opinion that Harrington was limited to sitting for no more than two hours per day. *See Due v. Massanari*, 14 F. App'x 659, 667 (7th Cir. 2001) (defining light work as "standing or walking for approximately six hours and sitting for two hours in an eight-hour day") (citing Soc. Sec. R. 83-10, 1983 WL 31251 and *Clifford v. Apfel*, 227 F.3d 863, 868 n.2 (7th Cir. 2000) (defining light work to include intermittent sitting)). Even if medium work is inconsistent with Tan's sitting limitation, the record is devoid of any evidence to support a finding that Harrington suffers from such significant sitting limitations. Other than a vague reference in Harrington's application for benefits that he has difficulty getting comfortable when sitting, no evidence in the record suggests that he is unable to sit for extended periods of time. Further, Tan attributed Harrington's sitting limitations to his arthritis, specifically the tenderness in his hands, feet and finger joints. (Tr. 316-17). However, as discussed above, Harrington's arthritic symptoms have been well-controlled by medication and his images reveal no significant changes have occurred since a period of time when he was working at substantial gainful levels. Similarly, Tabechian's notes demonstrate that Harrington's arthritic symptoms have generally diminished over time. Accordingly, I conclude that the ALJ's RFC assessment adopted the limitations assessed by Tan and Eurenius that were supported by the evidence and that his decision to afford the opinions limited weight did not create a gap in the record. *Pellam v. Astrue*, 508 F. App'x at 90.

In any event, I conclude that the ALJ's RFC assessment was supported by substantial evidence. The record reflects that although Harrington has sought treatment for his

hip and arthritis, the physicians who treated Harrington for these impairments repeatedly found the impairments to be stable or improving.  Physical examinations of Harrington performed by Drinkwater and Eurenius generally found full range of motion in Harrington's back and extremities, although Eurenius noted some pain in Harrington's right hip upon rotation.  (Tr. 285, 308).  The examination performed by Eurenius revealed that Harrington had difficulty squatting, pain in his right hip upon rotation, a positive straight leg test, tenderness in his medial finger and swelling in his wrists.  The ALJ's RFC accounted for Harrington's physical impairments by limiting him to less than the full range of medium work with postural, handling and environmental limitations.  Thus, the ALJ's RFC assessment was reasonable and supported by substantial evidence.  *Pellam*, 508 F. App'x at 91.

## CONCLUSION

This Court finds that the Commissioner's denial of DIB was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 10) is GRANTED**.  Harrington's motion for judgment on the pleadings **(Docket # 7)** is **DENIED**, and Harrington's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
     February 25, 2015